UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HEIDI Y. GALVEZ, <br><br> Plaintiff, <br><br> v. <br><br> FORD MOTOR COMPANY, and DOES 1-10, inclusive, <br><br> Defendants. | No. 2:17-cv-02250-KJM-KJN <br><br><br> ORDER |

Plaintiff alleges defendant knowingly sold her a truck with a defective engine and provided only short-term repairs until her warranty expired. Defendant moves for summary judgment, arguing plaintiff cannot meet her burden on her fraud and California Consumer Legal Remedies Act claims and that all of her claims are barred by the statute of limitations. For the following reasons, the court GRANTS defendant's motion.

I. BACKGROUND

A. Galvez's Purchase of a Ford F-250 and Issues with its Engine

The court designates as an undisputed material fact ("UMF") only facts the parties have identified as undisputed. *See* Pl.'s Resp. to Def.'s St. of Undisputed Facts, ECF No. 30-1. On March 6, 2006, plaintiff Heidi Y. Galvez purchased a new 2006 Ford F-250 truck ("the truck"). Undisputed Material Fact (UMF) 1. Galvez purchased the truck to transport her dogs in

1

two side-by-side dog kennels. Galvez Depo., ECF No. 30-3 at 19:15-22. Galvez's purchase was accompanied by Ford's express warranties "to preserve or maintain the utility or performance of Plaintiff's vehicle or to provide compensation if there was a failure in such utility or performance." First Am. Compl. ("FAC"),[1] ECF No. 3 ¶ 8. The warranty expired in 2012, at which point Galvez purchased an extended warranty. Galvez Depo. at 71:20-72:3.

Before purchasing the truck, Galvez relied on Ford's television commercials dating back to the 1990s, which advertised Ford vehicles as "Built Ford Tough." *Id.* at 17:1-9, 18:13-16. She is unsure whether she relied on a single commercial or more than one, and she does not remember anything from the commercials other than the slogan, "Built Ford Tough." *Id.* at 18:18-25. Galvez does not recall reviewing written advertising materials or relying on any Ford promotional materials other than the television commercials. *Id.* at 17:10-23. She does recall, however, speaking with a sales representative at Future Ford for several hours before purchasing her truck, and relying on the representative's statement that the truck would be "[l]onger lasting because it was a diesel." *Id.* at 23:7-24:25.

Galvez's truck was equipped with a 6.0-liter diesel engine ("the engine"), which Ford obtained from its supplier Navistar International Transportation Company. FAC ¶¶ 18, 19. At the time of delivery, Galvez's truck had serious defects and nonconformities to warranty, including engine, transmission and HVAC[2] defects. *Id.* ¶ 9. Shortly after she purchased the truck, Galvez "began experiencing problems with the vehicle, including a number of engine-related problems." Supp'l Br., ECF No. 35 at 2-3.[3] On September 29, 2006, after Galvez took her truck to the dealer because several warning lights came on, including an engine service light, the dealer made repairs and told her the issue was fixed. Galvez Depo. at 33:8-18; Galvez Ex. 3, ECF No. 30-5 at 2 (Sept. 29, 2006 entry on service claims list noting Galvez complained "water

---

[1] Although the court refers to the complaint for necessary background information, it does not treat the complaint's allegations as undisputed.

[2] The complaint does not define the acronym "HVAC," though that acronym refers to a heating, ventilation and air condition system in common parlance.

[3] All citations to briefs refer to ECF page numbers, not the briefs' internal pagination.

2

in fuel light comes on" and "ok now"). On January 19, 2007, Galvez again took the truck to the dealer because the "service engine soon" light came on, and the dealer again represented to Galvez that it had fixed the issues. *Id.* at 3 (Jan. 19, 2007 entry on service claims list noting "retest good" after servicing). Galvez took the truck in again on June 7, 2011, again complaining the engine light was on, and the dealer yet again advised the problem was fixed. *Id.* at 4-5 (June 7, 2011 entry on service claims list noting Galvez complained "service engine soon light is on" and technician advised Galvez "not to have ignition on" while fueling and to "report if the light comes back on" and no "further repair/inspections performed at this time"). Galvez viewed the check engine light as a safety concern because her manual indicated a check engine light requires immediate service and must be "checked out right away." Galvez Depo. at 33:23-34:4, 44:23-45:17. She was worried the truck was unreliable and may "strand [her] somewhere." *Id.* at 45:10-12. She was also concerned because twice, on unspecified dates, the truck's electronic components suddenly stopped working, preventing Galvez from rolling the windows down and using the truck's air conditioning. *Id.* at 45:13-17.

Also in 2006, Galvez noticed a "death wobble" in the truck, which caused her to "lose control" as "[t]he truck literally hydroplane[d] across the road" when she hit bumps in the road. Galvez Depo. at 32:4-18; *see* UMF 6;. Galvez complained to a Ford dealer about the death wobble several times in 2006 and 2007, but the dealer only advised her to keep her tires properly inflated. *See* UMF 7; Galvez Depo. at 38:4-24, 42:3-8. In 2010, the death wobble caused the truck to change lanes on its own while Galvez was driving with her eleven-year-old son as a passenger. Galvez Depo. at 44:2-6; *see* UMF 9. By 2011, Galvez felt Ford was dismissive of her complaints about the death wobble. UMF 8, 10. Ford never fixed the death wobble, though a third-party garage reduced the wobble in 2017. Galvez Depo. at 39:16-40:16. In a similar case, Ford's experts testified that the death wobble is the result of inadequate tire pressure rather than a defect. Higgins Decl., ECF No. 30-2 ¶ 6; Galvez Ex. 4, ECF No. 30-6 at 5. Regardless, the parties confirmed at hearing it is undisputed that the death wobble is not related to the engine defects at issue here.

/////

3

Beginning in 2011 and continuing to this day, Galvez "rarely drive[s] the [truck]" and instead "use[s] other vehicles for daily driving needs." Galvez Decl., ECF No. 35-1 ¶ 6. At some point between 2016 and 2017, however, she "noticed that the vehicle was regularly exhibiting engine problems similar to those that it had exhibited during the warranty period." *Id.* ¶ 7. Galvez took the truck to a third-party garage in 2016 and 2017 where she was informed that the engine's problems were "common" and "widespread." *Id.* ¶ 8. In 2017, she realized, for the first time, "the extent of the defects and that her problems before this date were related to this same engine defect." *Id.*; Supp'l Br. at 4. Before 2017, Galvez had "no knowledge that the engine in [her truck] was defective and/or incapable of being repaired" because she had relied on Ford's representations that the problems were repaired or did not exist. Galvez Decl. ¶¶ 5, 8.

The crux of Galvez's suit is that "Ford's 6.0 liter engines in general have had severe and pervasive quality defects, which Ford failed to disclose to consumers." FAC ¶ 33. She says these defects result in "continuing problems with turbo charger systems, fuel injection systems, head gaskets, EGR valves, cooling systems and coolers plugging, and many other problems." *Id.* Galvez alleges Ford was aware of the 6.0 liter engine defects as early as 2002. *See id.* ¶ 37. She contends that as Ford prepared to release its 2003 model, Ford's Chief Engineer of Diesel Engines, Charlie Freese, "identified 'multiple high risk items' with the vehicles." *Id.* ¶¶ 39-40. Ford went on to sell models with the defective engines, despite its inability to resolve these problems and despite identifying its engine supplier, Navistar, as a "High Risk" supplier. *Id.* ¶¶ 41-43, 51; *see also id.* ¶¶ 44-45 (alleging Ford was also aware of engine defects in its 2006 model). In January 2007, Ford sued Navistar for "exceptionally high repair rates and warranty costs due to quality problems attributable to Navistar" and "design flaws." *Id.* ¶ 48 (internal quotation marks omitted). Despite its knowledge of the engine defects, Ford represented its vehicles were of high quality. *Id.* ¶¶ 49, 66-69. Ford had its dealers use a "Band-Aid strategy" of providing only minimal repairs to survive the five-year or 100,000-mile warranty rather than resolve the engine's defects within the warranty period. *Id.* ¶¶ 52-59.

Galvez identifies three class action lawsuits involving claims arising from the engine defects at issue here: *Adams v. Ford Motor Company*, No. 37-2012-91290-CR-BC-CTL in

San Diego County Superior Court, filed January 25, 2012; *Burns v. Navistar Inc.& Ford Motor Co.*, 10-cv-2295-LAB-BGS in the United States District Court, Southern District of California, filed November 5, 2010; and *Custom Underground, Inc. v. Ford Motor Co.*, 1:10-cv-00127, in the United States District Court, Northern District of Illinois, filed January 8, 2010. *Id.* ¶¶ 77-108, 1-1–9-1.[4] These three class actions were consolidated in a multi-district litigation matter, *In re: Navistar 6.0 L Diesel Engine Products Liability Litigation*, No. 11-c-2496, in the United States District Court, Northern District of Illinois. *Id.* ¶¶ 81, 91, 103. Galvez was a putative class member in *Adams*, *Burns* and *Custom Underground*. *Id.* ¶¶ 77, 86, 98. She ultimately was defined out of the final settlement class in *In re: Navistar*, in November 2012 "at the very latest," because her truck did not receive the repairs at issue during its first five years or 100,000 miles in service, whichever came first. *Id.* ¶¶ 1-1, 8-1.[5] Prior to filing suit here, Galvez never knew of or attempted to determine whether any class actions had been filed against Ford related to the engine defects she complains of. UMF 11.

B. Procedural History

Galvez filed this lawsuit on September 29, 2017 in state court, ECF No. 1-1, and filed her operative first amended complaint on October 6, 2017. She alleges fraud in the inducement (intentional misrepresentation), *id.* ¶¶ 17-1–71-1; negligent misrepresentation, *id.* ¶¶ 72-1–94-1; fraud in the inducement (concealment), *id.* ¶¶ 95-1–117-1; fraud in the performance of a contract—intentional misrepresentation, *id.* ¶¶ 118-1–165-1; violation of the California Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750, *et seq.*, *id.* ¶¶ 166-1–186-1; and violation of the Song-Beverly Consumer Warranty Act ("Song-Beverly"), Cal. Civ. Code § 1790, *et seq.*, *id.* ¶¶ 187-1–202-1. After removing the matter to this court, *see* Removal

---

[4] The paragraph numbering of Galvez's allegations begins anew after paragraph 108. To avoid confusion, the court refers to all paragraphs after paragraph 108 by adding the suffix "-1."

[5] Neither party requests the court judicially notice these suits. Nonetheless, the parties do not dispute the names, dates, locations of these cases or Galvez's role as a putative class member who was ultimately defined out of the class in the consolidated action. Rather, the parties dispute only the effect of these suits on the timeliness of Galvez's claims.

5

Not., ECF No. 1, Ford filed a motion for judgment on the pleadings, ECF No. 5. While Ford's motion was pending before the court, Ford filed a motion for summary judgment, Mot., ECF No. 24, which Galvez opposed, Opp'n, ECF No. 30, and to which Ford filed a reply, Reply, ECF No. 31. At hearing, the parties agreed the court should address the motion for summary judgment before addressing the motion for judgment on the pleadings. Also at hearing, the court granted plaintiff leave to file a supplemental opposition brief to address Ford's additional arguments regarding the statute of limitations raised in its reply brief. *See* ECF No. 34 (hr'g mins.). Galvez then filed her supplemental brief and a declaration. Supp'l Br.; Galvez Decl. The court submitted the matter and resolves it here. *See* ECF No. 34.

II. <u>LEGAL STANDARD</u>

A court will grant summary judgment "if . . . there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The "threshold inquiry" is whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).[6]

The moving party bears the initial burden of showing the district court "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The burden then shifts to the nonmoving party, which "must establish that there is a genuine issue of material fact . . . ." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585 (1986). In carrying their burdens, both parties must "cit[e] to particular parts of materials in the record . . . ; or show [] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1); *see also Matsushita*, 475 U.S. at 586 ("[the nonmoving party] must do more than simply show that there is some metaphysical doubt as to the material facts"). Moreover, "[o]nly disputes over facts that might affect the outcome of the

---

[6] Rule 56 was amended, effective December 1, 2010. However, it is appropriate to rely on cases decided before the amendment took effect, as "[t]he standard for granting summary judgment remains unchanged." Fed. R. Civ. P. 56, Notes of Advisory Comm. on 2010 amendments.

6

suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.

In deciding a motion for summary judgment, the court draws all inferences and views all evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587-88; *Whitman v. Mineta*, 541 F.3d 929, 931 (9th Cir. 2008). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

III. <u>DISCUSSION</u>

    A. <u>Statutes of Limitations</u>

Galvez's CLRA and common law fraud claims, including her negligent misrepresentation claim, are subject to a three-year statute of limitations. Cal. Civ. Code § 1783 ("Any action brought under the specific provisions of [the CLRA] shall be commenced not more than three years from the date of the commission of such method, act, or practice."); Cal. Civ. Proc. Code § 338(d) (setting three-year statute of limitations for fraud running from "the discovery, by the aggrieved party, of the facts constituting the fraud"); *Ferguson v. JPMorgan Chase Bank, N.A.*, No. 2:14-CV-00328-KJM, 2014 WL 2118527, at *6 (E.D. Cal. May 21, 2014) (applying § 338(d)'s three-year statute of limitations rather than the two-year statue for negligence where the "claim is a form of deceit and is based in fraud").. California courts apply the four-year limitations period for warranties under the California Commercial Code to claims under Song-Beverly, which does not contain its own statute of limitations. *Yi v. BMW of N. Am., LLC*, No. 2:17-CV-06467-SVW, 2018 WL 3359016, at *3 (C.D. Cal. May 24, 2018) (citing *Mexia v. Rinker Boat Co., Inc.*, 174 Cal. App. 4th 1297, 1306 (2009); *Krieger v. Nick Alexander Imports, Inc.*, 234 Cal. App. 3d 205, 211 (1991)). Whether the statute of limitations bars a claim is generally a question of fact. *E-Fab, Inc. v. Accountants, Inc. Services*, 153 Cal. App. 4th 1308, 1320 (2007) (citation omitted). The statute of limitations issue becomes a question of law, however, when the facts yield only one reasonable conclusion. *Id.* (citations omitted).

/////

Under California law, "the limitations period, the period in which a plaintiff must bring suit or be barred, runs from the moment a claim accrues." *Aryeh v. Canon Bus. Solutions, Inc.*, 55 Cal. 4th 1185, 1191 (2013). The "last element" accrual rule provides that absent any equitable exception, a claim accrues upon "the occurrence of the last element essential to the cause of action." *Id.* (citations and internal quotation marks omitted). CLRA claims in consumer cases generally accrue on the date of purchase, though a consumer is charged with a duty to reasonably investigate only when the alleged defect manifests. *See Philips v. Ford Motor Co.*, No. 14-CV-02989-LHK, 2015 WL 4111448, at *8 (N.D. Cal. July 7, 2015) (citing *Plumlee v. Pfizer, Inc.*, No. 13-CV-00414 LHK, 2014 WL 4275519, at *7 (N.D. Cal. Aug. 29, 2014), *aff'd*, 664 . App'x 651 (9th Cir. 2016); *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797, 808 (2005) (plaintiffs are not charged with knowledge under discovery rule until "information of circumstances to put [them] on inquiry or if they have the opportunity to obtain knowledge from sources open to [their] investigation") (citation and internal quotation marks omitted)). Similarly, Song-Beverly claims accrue when the plaintiff discovers or reasonably should have discovered the breach of warranty, and such claims may accrue before an express warranty expires. *Yi*, 2018 WL 3359016, at *4.

Here, Galvez purchased the truck on March 6, 2006. UMF 1. She sued Ford more than eleven years later, on September 29, 2017. *See* ECF No. 1-1 (original complaint). It is apparent from the face of Galvez's complaint that her claims are time-barred unless saved by tolling. Because a plaintiff bears the burden of proving tolling at trial, Galvez bears the burden of establishing a triable issue as to tolling to survive summary judgment. *See Anagnostellis v. Pitney Bowes Inc.*, No. CV 12-239 PSG MRWX, 2013 WL 8840335, at *2 (C.D. Cal. Mar. 5, 2013). Although Galvez invokes several tolling doctrines to save her claims, she has not met her burden in establishing a triable issue as to any tolling exception and her claims are therefore time-barred.

1. <u>Delayed Discovery and Fraudulent Concealment</u>

The discovery rule postpones accrual of a claim until "the plaintiff discovers, or has reason to discover the cause of action." *Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1024 (9th Cir. 2008) (quoting *Norgart v. Upjohn Co.*, 21 Cal. 4th 383, 397 (1999)). To

successfully invoke the discovery rule, a plaintiff must show "(1) the time and manner of discovery and (2) the inability to have made earlier discovery despite reasonable diligence." *E-Fab, Inc.*, 153 Cal. App. 4th at 1319 (emphasis omitted); *see also Clemens*, 534 F.3d at 1024 ("A plaintiff must affirmatively excuse his failure to discover the fraud . . . by showing that he was not negligent in failing to make the discovery sooner and that he had no actual or presumptive knowledge of facts sufficient to put him on inquiry.") (quoting *Bedolla v. Logan & Frazer*, 52 Cal. App. 3d 118, 129 (1975)).

Under the fraudulent concealment doctrine, the statute of limitations is tolled "where a defendant, through deceptive conduct, has caused a claim to grow stale." *Aryeh*, 55 Cal. 4th at 1192 (internal citation omitted). This doctrine is available only if the plaintiff shows: "(1) the substantive elements of fraud, and (2) an excuse for late discovery of the facts." *Cmty. Cause v. Boatwright*, 124 Cal. App. 3d 888, 900 (Ct. App. 1981). To establish an excuse for late discovery, the plaintiff must show "(1) when the fraud was discovered; (2) the circumstances under which it was discovered; and (3) that the plaintiff was not at fault for failing to discover it or had no actual or presumptive knowledge of facts sufficient to put him on inquiry." *Id.*; *see also Grisham v. Philip Morris U.S.A., Inc.*, 40 Cal. 4th 623, 637 (2007) (explaining fraudulent concealment tolling "will last as long as a plaintiff's reliance on the misrepresentations is reasonable").

Based on the record before the court, no reasonable juror could conclude Galvez exercised reasonable diligence or was not at fault for failing to discover her claim at some point prior to 2017. *See* Galvez Decl. ¶ 7. The record contains the following evidence regarding Galvez's awareness of the engine's defects: Just "shortly" after purchasing the truck, Galvez "began experiencing problems with the vehicle, including a number of engine-related problems." Supp'l Br. at 2-3. Her truck's water and fuel lights were on as early as September 29, 2006, a little more than six months after she purchased the truck, but the Ford dealer told her it fixed the issue. *See* Opp'n at 10. On January 19, 2007, "the service engine soon" light came on and the Ford dealership again informed Galvez the issue was corrected. *Id.* at 10-11. On June 7, 2011, she took the truck to the dealer complaining the service engine soon light was on again, and the

9

dealer again advised the problem was fixed. Galvez Ex. 3 at 5. Also, at some point between 2007 and 2011, Galvez left her truck with a Ford dealership for two or three days to add a pump to "help alleviate whatever the problem was" with the truck's engine, but the check engine light continued to come on. Galvez Depo. at 55:2-58:7. Owing in part to the check engine light, Galvez worried the truck was unreliable and might "strand [her] somewhere," *id.* at 45:2-12, and, after 2011, she "rarely" drove the truck, Galvez Decl. ¶ 6. Then, at some point in 2016 or 2017, Galvez "noticed that the vehicle was regularly exhibiting engine problems similar to those it had exhibited during the warranty period." *Id.* ¶ 7. She finally discovered her claim approximately eleven years after purchasing the truck when employees at a third-party garage told her the engine in her truck was subject to "common, widespread problems." *Id.* ¶ 8. The check engine light remains on to this day. Galvez Depo. at 60:18-22, 61:18-19.

These facts, even viewed in a light most favorable to Galvez, confirm that well before her purported 2017 discovery she had a factual basis to suspect her injury but did not attempt to investigate it. The repeated appearance of a check engine light in a brand-new automobile arguably alerts its owner that something is amiss, even where the dealer repeatedly represents that it has resolved the issue. *See, e.g.*, *Yi*, 2018 WL 3359016, at *6 (noting courts addressing Song-Beverly act claims have determined "plaintiff was on notice of his claims for statute of limitations purposes after as few as two or four repair visits for the same problem"). At the very least, the defect had manifested by 2011 with the third appearance of the engine light, particularly considering that Galvez at that time regarded the check engine light as a safety concern that rendered the truck unreliable. *See* Galvez Depo. at 33:23-34:3, 45:2-12; *see also Plumlee*, 2014 WL 4275519, at *7-9 (finding plaintiff's claim accrued when she stopped using prescription medication because she did not believe it was working and thus was provided circumstances to cause suspicion of wrongdoing). Armed with the "information of circumstances to put [her] on inquiry," *see Fox*, 35 Cal. 4th at 808, Galvez apparently took no action to investigate her concerns for six years, *see* Galvez Decl. ¶ 6. By only "rarely" driving the truck for that six-year period, Galvez establishes inaction, not diligence. *See Grisham*, 40 Cal. 4th at 637

/////

(explaining fraudulent concealment tolling "will last as long as a plaintiff's reliance on the misrepresentations is reasonable").

Galvez argues she "exercise[d] reasonable diligence in taking her vehicle in for repairs" and Ford's "repeated false assurances" the engines problems were fixed establish that she "could not discover the irreparable defects sooner . . . ." Opp'n at 17. But Ford provided the last such false assurance in 2011. *See* Galvez Ex. 3 at 4-5 (June 7, 2011 entry on service claims list). Ford's alleged misrepresentations cannot toll Galvez's claim indefinitely, and no reasonable juror could conclude those now-stale misrepresentations caused or otherwise excused Galvez's six years' delay. To the contrary, the balance of the record confirms Galvez has not met her burden. During the period at issue, Galvez specifically alleges she was a putative class member in three class actions alleging "the same claims and subject matter and similar evidence as the instant complaint" and alleging facts "substantially similar, if not identical to the facts alleged herein." *See* FAC ¶¶ 77, 79-80 (*Adams v. California*, filed Jan. 25, 2012), *id.* ¶¶ 86, 89-90 (*Burns v. Navistar Inc.*, filed Nov. 5, 2010), *id.* ¶¶ 98, 101-102 (*Custom Underground v. Ford Motor Co.*, filed Jan. 8, 2010)). Galvez avers she never knew these class actions existed, nor did she investigate whether cases were proceeding against Ford for the engine issues alleged here. Galvez Depo. at 47:13-48:10. Although Galvez argued at hearing that she was not obliged to search for these cases, she is required to show she "acted diligently to investigate whatever information was available to her when she suffered her injury." *See Plumlee*, 2014 WL 4275519, at *7; *Fox*, 35 Cal. 4th at 808 (plaintiff charged with presumptive knowledge of injury if she has suspicion and "the opportunity to obtain knowledge from sources open to [her] investigation") (citations,internal quotation marks and emphasis omitted). The three class actions demonstrate that during Galvez's several years of inaction, other similarly situated consumers identified the fraud alleged here and pursued their claims. In light of Ford's repeated allegedly unsuccessful attempts to repair the engine issues, Galvez's concerns about the truck's unreliability and her delay prior to bringing this suit, no reasonable juror could find she lacked inquiry notice or acted with diligence in pursuing her claim.

/////

If the court were to accept Galvez's tolling argument here, any consumer could indefinitely extend the statute of limitations by simply refusing to use the defective product, even after facts would have prompted a reasonable person to investigate. Galvez has not identified a triable issue of fact to allow the question of whether the discovery rule renders her claims timely to go to a jury.

### 2. Equitable Estoppel

Under California law, a party is equitably estopped from asserting a statute of limitations defense where: (1) the party to be estopped was apprised of the facts; (2) that party intended its conduct to be acted upon, or acted so that the party asserting estoppel had a right to believe it was so intended; (3) the party asserting estoppel was ignorant of the true state of facts; and (4) the party asserting the estoppel reasonably relied on the conduct to her injury. *Lukovsky v. City & Cty. of San Francisco*, 535 F.3d 1044, 1051–52 (9th Cir. 2008) (quoting *Honig v. San Francisco Planning Dep't*, 127 Cal. App. 4th 520, 529 (2005)). The doctrine is intended to ensure that a defendant who "lull[s] his adversary into a false sense of security" is not then able to plead a statute of limitations defense based on "the delay occasioned by his own conduct." *Kleinecke v. Montecito Water Dist.*, 147 Cal. App. 3d 240, 246 (1983).

For the reasons discussed above, Galvez has not shown she reasonably relied on Ford's conduct to her injury, nor has she shown Ford's actions "lull[ed]" her "into a false sense of security" that continued throughout the six-year period she decided to only "rarely" drive the truck. *See id.* Were this not an eleven-year-old truck and if the most recent alleged misrepresentation had been made less than six years prior to Galvez's claimed date of discovery, equity could perhaps relieve her from complying with the relevant statutes of limitations. On the record before the court, however, Galvez's longstanding inaction despite recurring problems with her truck cannot be attributed to Ford's alleged misrepresentations, and she therefore cannot estop Ford from relying on the statute of limitations. *See Torres v. Ford Motor Co.*, No. 117CV01453DADSKO, 2018 WL 2088268, at *3 n.2 (E.D. Cal. May 4, 2018) (noting equitable estoppel cannot render a claim timely where plaintiff was on inquiry notice of her claim).

3.      *American Pipe* Tolling

In federal court, the statute of limitations for an individual federal claim asserted in a class action is tolled during the pendency of the class action. *See American Pipe & Const. Co. v. Utah*, 414 U.S. 538, 554 (1974); *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 350 (1983). Under this rule, "[o]nce [putative class members] cease to be members of the class—for instance, when they opt out or when the certification decision excludes them—the limitation period begins to run again on their claims." *In re WorldCom Sec. Litig.*, 496 F.3d 245, 255 (2d Cir. 2007); *see also Choquette v. City of New York*, 839 F. Supp. 2d 692, 699 (S.D.N.Y. 2012) ("*American Pipe* tolling ends when a plaintiff opts out of the class or a class certification decision of the court definitively excludes that plaintiff."); *see* Opp'n at 18 (arguing *American Pipe* tolling lasts "until [the party] opts out of the class action settlement, or are otherwise removed from the class action").

Galvez contends she was a putative class member in *In re: Navistar Diesel Engine Prod. Liab. Litig.*, but was ultimately "defined out of the class" no later than November 2012. *See* FAC ¶ 1-1; Opp'n at 18-20; *see also In re Navistar Diesel Engine Prod. Liab. Litig.*, No. 11 C 2496, 2013 WL 10545508, at *1 (N.D. Ill. July 3, 2013) (noting court preliminarily approved proposed settlement and class notice in November 2012). Galvez thus alleges the applicable statutes of limitation were tolled beginning either January 25, 2012 when *Adams* was filed, FAC ¶ 85, or November 5, 2010 when *Burns* was filed, *id.* ¶ 97, or January 8, 2010 when *Custom Underground* was filed, *id.* ¶ 108. She alleges tolling continued until November 2012, when *In re: Navistar*, with which *Adams*, *Burns* and *Custom Underground* were consolidated, excluded her from the class definition. *Id.* ¶ 98.

Ford contends Galvez cannot invoke *American Pipe* tolling because *In re: Navistar* is a cross-jurisdictional action. Reply at 5. The Ninth Circuit has declined to "import the doctrine of cross-jurisdictional tolling into California law." *See Clemens*, 534 F.3d at 1025; *but see Hatfield v. Halifax PLC*, 564 F.3d 1177, 1188-89 (9th Cir. 2009) (holding California residents may seek equitable tolling in lieu of *American Pipe* tolling). Neither party addresses

/////

whether Galvez's reliance on *Adams v. Ford*, which was originally filed in San Diego County Superior Court before being consolidated in *In re: Navistar*, is also barred under *Clemens*.

Nonetheless, the court need not resolve this issue here. Even assuming the statute of limitations on Galvez's claims did not start running before any of the class actions she relies on here were filed, and further assuming her claims were tolled under *American Pipe* until she was defined out of the *Navistar* class in November 2012, she still did not file her action within the relevant limitations periods. Under this theory, Galvez's CLRA and fraud claims were timely only if filed on or before November 2015 and her Song-Beverly claim was timely only if filed on November 2016. But Galvez did not file her initial complaint until September 29, 2017. *See* ECF No. 1-1 (complaint). Thus, even if *American Pipe* applies here, it would not render Galvez's claims timely.

B. Rule 56(d)

Under Rule 56(d), when "a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." Fed. R. Civ. P. 56(d).

Galvez requests the court defer ruling on this motion because she requires additional discovery on "Ford's attempts to misrepresent and conceal information which could have led to the discovery of [her] claims, and Ford's conduct in concealing known [*sic*] these known engine defects from the public." Opp'n at 15. A declaration accompanying her request states only that "Ford's Motion is premature as the parties have not yet completed all necessary fact discovery in this matter," ECF No. 30-2 ¶ 4, and attaches an email exchange between counsel noting Galvez has not yet deposed Ford's expert and Ford has not yet inspected Galvez's truck. ECF No. 30-4 (email exchange).

Galvez has not identified any discovery necessary to complete the record on the timeliness of her claims. Her beliefs and actions are within her own knowledge, and additional discovery concerning Ford's concealment of the defect would not reveal why she reasonably should not have discovered her claim well before 2017 or why she reasonably took no action

14

throughout the 2011 through 2016 period.  Because none of the discovery Galvez seeks is necessary to her defense on the statute of limitations issue, she has not shown discovery would uncover "facts essential to justify [her] opposition."  *See* Fed. R. Civ. P. 56(d).

        Galvez's Rule 56(d) motion is DENIED.

IV. <u>CONCLUSION</u>

        There is no triable issue of fact as to the timeliness of this suit.  Accordingly, Ford's motion for summary judgment is GRANTED and Ford's motion for judgment on the pleadings is MOOT.  This case is CLOSED.

        IT IS SO ORDERED.

DATED:  September 30, 2018.

_____
UNITED STATES DISTRICT JUDGE